# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# CENTRAL DIVISION

**GWENN MARIE DAVIS**                                                                 **PLAINTIFF**

VS.                                  No. 4:20-cv-00360 PSH

**ANDREW SAUL, Commissioner,**
    **Social Security Administration**                                              **DEFENDANT**

## ORDER

Plaintiff Gwenn Marie Davis ("Davis"), in her appeal of the final decision of the Commissioner of the Social Security Administration (defendant "Saul") to deny her claim for Disability Insurance benefits ("DIB"), advances two arguments. First, she contends the Administrative Law Judge ("ALJ") erred by failing to fully and fairly develop the record by failing to obtain additional medical evidence regarding her postural orthostatic tachycardia syndrome ("POTS").[1]  Second, Davis contends the Appeals Council erred by failing to consider new, material evidence -- a June 2019

---

[1] Postural orthostatic tachycardia syndrome (POTS) is a condition that affects blood flow. POTS causes the development of symptoms -- usually lightheadedness, fainting and an uncomfortable, rapid increase in heartbeat -- that come on when standing up from a reclining position and relieved by sitting or lying back down. https://my.clevelandclinic.org/health/diseases/16560-postural-orthostatic-tachycardia-syndrome-pots.

prescription for a rolling walker. The parties have ably summarized the testimony given at the administrative hearing conducted on December 4, 2018. (Tr. 30-58). The Court has carefully reviewed the record, including the medical records, to determine whether there is substantial evidence in the administrative record to support Saul's decision. 42 U.S.C. § 405(g). The relevant period under consideration is from April 7, 2016,[2] through May 9, 2019, the date of the ALJ's decision.

*The Administrative Hearing:*

In response to questions posed by the ALJ, Davis stated she was 45 years old and lived with her husband. She received a nursing degree and worked a variety of nursing jobs in the eleven years preceding the hearing. Her most recent nursing position was as a CCU nurse at St. Vincent's Infirmary from 2013-2016. She explained that she left this job because of health issues, was denied short term disability, and then unsuccessfully attempted to move to part-time work.

Davis described impairments, including bursitis in both hips, although worse on the right side. Medications helped with her fibromyalgia but "do not take care of it altogether." (Tr. 42). Davis also took medication for hypertension and asthma, and allowed she was trying to cease smoking. The medication she took for headaches

---

[2] Although Davis alleged an onset date of March 2, 2016, the relevant period for purposes of this case begins on April 7, 2016, the day after a final determination of a prior application filed by Davis.

helped but she nevertheless testified to daily headaches. Davis noted medications were taken for insomnia (Ambien, which was helpful) and for depression. Her POTS resulted in dizziness and vertigo when she arose after sitting or lying down. Davis received a home infusion of dextrose for dehydration to address POTS symptoms. Although this was not a prescribed treatment, Davis credited it as helpful. She cited a history of tremors in her hands and stated she experienced a "brain fog." (Tr. 49).

Davis estimated she could stand for 10-15 minutes, sit for 30-45 minutes, and lift or carry 5-10 pounds. She stated she could not walk without a walker or help due to the bursitis and fibromyalgia. She drove "very rarely." (Tr. 36). She did little in the way of daily chores, helping with folding clothes and dishes. She no longer attended church, and a typical day would include watching television, playing computer games, and doing crafts. (Tr. 35-49).

Davis' attorney questioned her further. In response, she said the fibromyalgia extends down her right arm and hand 4-5 days per week. She also explained she took prescription pain medicine for her severe headaches, which she experienced 3-5 times per week. Her tremors were in both hands and lasted all day on occasions. Her medication was helpful with the tremors. Davis described memory problems which caused her to forget to take her medications, forget doctor's appointments, and forget to eat. Her husband assisted her with these issues. She and her husband installed rails

in their house to assist her movements, and her husband helped her in and out of the bathtub, and on and off with her bra. She indicated she used a walker with a seat when her bursitis was bad. (Tr. 50-55).

Dwight Turner ("Turner"), a vocational expert, testified. After reviewing Davis' past relevant work as a nurse, Turner was asked to consider a hypothetical worker of Davis' age, education, and experience, who could perform sedentary work with the following restrictions: she could occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; occasionally reach overhead; occasionally be exposed to extreme cold, vibration, and pulmonary irritants; frequently handle; never climb ladders, ropes, or scaffolds; never be exposed to unprotected heights or dangerous moving machinery; never operate a motor vehicle at work; could understand and remember simple and detailed instructions; could sustain attention and concentration to complete tasks with regular breaks every two hours; could interact as needed with supervisors, co-workers, and the public; and could adapt to occasional workplace changes. Turner responded that such a worker could not perform Davis' past relevant work as a registered nurse. Turner opined, however, that such a worker could perform the jobs of callout operator, surveillance system monitor, and telephone quotation clerk. Turner further testified that such a worker would not be able to perform the cited jobs if her impairments required

additional breaks and resulted in her being off-task 15% of the workday. (Tr. 56-58).

*ALJ's Decision:*

In his May 9, 2019, decision, the ALJ determined Davis had the following severe impairments: obesity, fibromyalgia, bursitis of the hip, migraine headaches, POTS, hypertension, asthma versus COPD with tobacco use, history of palpitations, history of tremors, and history of insomnia, depression, and neurocognitive symptoms. The ALJ found Davis did not have an impairment or combination of impairments that met a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ expressly considered if Davis' mental impairments met Listing 12.02 or 12.04. The ALJ considered the "paragraph B" criteria regarding mental impairments, finding Davis had a moderate limitation in understanding, remembering, or applying information, a mild limitation in interacting with others, a moderate limitation in concentrating, persisting, or maintaining pace, and a moderate limitation in adapting or managing oneself. The ALJ further determined Davis had the residual functional capacity ("RFC") to perform sedentary work with the restrictions which mirrored those contained in the hypothetical question posed to Turner. The ALJ, citing the appropriate factors, assessed Davis' subjective allegations, finding her statements "not entirely consistent with the medical evidence and other evidence in the record." (Tr. 20). The ALJ thoroughly discussed the medical evidence, beginning with treatment

notes from September 2015. After a thorough review, the ALJ summarized the medical evidence as follows:

> Overall, despite multiple workups and diagnoses, examinations of the claimant are generally normal. The claimant's subjective allegations are not observed as there is no evidence of an observed or measured seizure activity and the claimant's tics and tremors were not observed   There is some evidence that the claimant used a walker, but no medical provider prescribed this. Furthermore, medical evidence of record more often indicates that the claimant has a normal gait, normal strength, and normal coordination, which is inconsistent with the need for a walker. Furthermore, the claimant alleges intense pain, but on examination is consistently in no acute distress. The undersigned gives significant weight to the claimant's subjective pain allegations in order to limit the claimant to less than sedentary work . . .

(Tr. 22).

He also gave little weight to an August 2016 medical source statement indicating Davis was unable to work. The ALJ noted the medical source statement did not provide a function by function analysis, and further noted that the question of ability to work was reserved for the Commissioner. The ALJ assigned "some weight" to a state agency medical opinion at the initial level, where the physician opined Davis could perform the full range of sedentary work. At the reconsideration level, the state agency physician opined Davis could perform less than the full range of sedentary work, and the ALJ accorded this opinion great weight. The ALJ determined Davis could not perform her past relevant work. However, relying upon Turner's testimony, the ALJ held Davis could perform other work in the national economy. Accordingly,

6

the ALJ concluded she was not disabled. (Tr. 10-25).

*Medical Evidence During Relevant Period:*

The relevant period commenced on April 7, 2016.

**2016**

Davis was seen at the Walker Heart Institute Cardiovascular Clinic on August 2, 2016, by Dr. Bogomilov ("Bogomilov"), complaining of palpitations, shortness of breath, and syncope. This was a follow up visit. She indicated she could not walk without a walker. A physical examination reflected she was 5'7" and weighed 203 pounds, with a regular heart rate and rhythm. She was assessed with palpitations, hypertension, syncope, dizziness, vertigo, weakness, fatigue, and dysautonomia. Bogomilov wrote: "She is stable at least at present." (Tr. 561). The plan was for Davis to be referred to be seen at Vanderbilt Medical Center, and for her to apply for disability, with Bogomilov to "fill out papers to support her claim." (Tr. 561). (Tr. 557-561).

On September 8, Davis was seen as a new patient by Dr. Chi ("Chi") at OrthoArkansas. Her main complaint was hip pain and she also stated she had "myalgias, pain in her hands, lightheadedness, extreme fatigue, tremors, 'brain fog,' and forgetfulness." (Tr. 367). In addition, she complained of muscle aches all over, cramping, constant pain, hair loss, and ulcers in her nose. A physical examination

showed her to be healthy appearing, well nourished, well developed, in no acute distress, and ambulating normally. The examination generally reflected normal findings except for tenderness in her neck, hand, and shoulders, extreme tenderness in her hips, general musculoskeletal tenderness, and an ulcer in her left nostril. She was diagnosed with fibromyalgia and bursitis. (Tr. 365-368).

Davis returned to OrthoArkansas on September 30. She was noted to be healthy appearing, well nourished, well developed, in no acute distress, but ambulating with a walker. Her physical examination was similar in some respects to the exam two weeks earlier. She again had tenderness in her neck, hands, shoulders, and general musculoskeletal tenderness. The September 30 exam noted a tremor, noted "full range of motion" in her hips, with no mention of tenderness in this area, and "normal gait and station." (Tr. 362). Davis was diagnosed with fibromyalgia, disorder of autonomic nervous system, unspecified, and tremor. (Tr. 361-363).

On October 5, Davis was seen by Angela Paylor ("Paylor"), APRN, at St. Vincent's Clinic in Morrilton for refills and to update her records. Her general appearance was "alert and oriented, no acute distress, comfortable, anxious, cooperative, fatigued female, interacting appropriately, abnormal gait, pleasant, well developed and well nourished, well groomed, well hydrated, with walker today." (Tr. 468). An antalgic gait and tremor were noted in her neurologic exam, and her

psychological exam noted she was depressed, anxious, had memory loss, but also that she had normal judgment and insight, normal speech, and appropriate mood and affect with no thought disorder. She was assessed with migraine headaches, dysautonomia orthostatic hypotension syndrome, tremor, bursitis, and fibromyalgia. Some changes were made in Davis' prescriptions, she was counseled regarding diet and exercise, and directed to return in six months. (Tr. 466-470).

Dr. James Muldowney ("Muldowney"), at Vanderbilt University Medical Center, saw Davis on December 9. Muldowney performed an autonomic function test, utilizing a tilting method whereby Davis was to be tilted in differing time periods and positions. Davis reported feeling sick with blurry vision during the tilt. She also said she felt bad and passed out after the tilt. Muldowney found no orthostatic hypotension was present, no excessive orthostatic tachycardia was present, and "grossly intact autonomic function." (Tr. 394-395).

**2017**

On January 31, Davis was seen as a new patient by Dr. George Nawar ("Nawar") at the Morrilton Surgery Center. Her chief complaint was the need for IV access, and Davis' history was recorded as "patient with POTS needing IV access on a long basis." (Tr. 539). Nawar reviewed Davis' systems, noting her bursitis, and noting Davis denied any musculoskeletal problems, such as pain or weakness.

9

Nawar's physical examination found Davis to be well developed, well nourished, in no acute distress. Other physical findings were unremarkable. Nawar's impression/diagnosis was chronic venous insufficiency, POTS, asthma, tremor, migraine. Nawar proposed a "Porth-a-cath" procedure to be performed on February 1. (Tr. 539-541.)

Nawar performed the procedure without complications on February 1. (Tr. 533-536).

Kenneth Hobby ("Hobby"), Ph.D., conducted a consultative mental diagnostic evaluation of Davis on February 14. Hobby found Davis able to understand, carry out, and remember basic work-like tasks. He also found, among other things, Davis had no difficulty in understanding instructions, no significant limitations in her capacity to communicate and interact in a socially adequate manner, and could manage her own funds. (Tr. 397-406).

Davis returned to Nawar on February 16 complaining of problems with the port placed on February 1. Nawar found the port was functioning normally but that a sharp bend in the catheter could have caused a problem. (Tr. 509-510).

Davis had a follow up visit on February 21 with Bogomilov, who diagnosed hypertension, syncope, dizziness, vertigo, weakness, fatigue, and dysautonomic orthostatic hypotension syndrome. Davis was given a Holter monitor to watch her average heart rate, and directed to return in three months. (Tr. 562-566).

Davis returned to Nawar on May 14 complaining of pain and swelling at the port site. These problems were, according to Nawar, the result of Davis inadvertently missing the port membrane when injecting medications. Nawar examined Davis and found her to be stable and able to resume normal daily activities. She was instructed to return in two weeks. (Tr. 481-483).

On May 25, Davis presented at the emergency department of St. Vincent's Hospital in Morrilton complaining of a cough and seeking a different antibiotic to treat an infection near her port (Nawar had previously prescribed an antibiotic). She was alert and in no acute distress. She was diagnosed with an infection of her port and sinusitis and discharged. (Tr. 514-519).

Davis returned to Bogomilov on August 3, primarily to review the Holter monitor results. She was assessed with palpitations, PACs, and PVCs.[3] Bogomilov was pleased with the Holter monitor results, noting her average heart rate of 87 was "much better." (Tr. 567) Bogomilov was to see Davis again in a month. (Tr. 567-571).

**2018**

Davis presented at Baptist Health Neurology Clinic on January 17, complaining

---

[3] PAC is a premature atrial contraction, and PVC is a premature ventricular contraction. See www.webmd.com.

of seizures and hearing loss. Davis stated she had been having seizures for two years. According to Davis, the seizures were preceded by lightheadedness and dizziness, then hot flashes, blurry vision and palpitations, and then she would go limp for 1-2 minutes. She indicated the typical seizure duration was up to 45 minutes. She was observed to have a normal gait. The plan was to perform an EEG and refer Davis to a cardiologist because the episodes could be related to syncope. (Tr. 548-553).

An ECG test was performed by Bogomilov on January 18. He found the ECG was abnormal, perhaps secondary to pulmonary disease. (Tr. 578). Bogomilov also saw Davis that same date, and her primary complaint was low blood pressure. Bogomilov examined her and diagnosed her with palpitations, PACs, and PVCs.. Minor changes were made in her medications and she was instructed to return in six months. (Tr. 572-578).

Davis returned in July to Bogomilov, who noted her history of inappropriate sinus tachycardia and postural orthostatic tachycardia syndrome. He also noted her history of noncompliance with medications. Despite her seizure episodes, Bogomilov stated her "lightheadedness, dizziness, orthostatic hypotension, and inappropriate sinus tachycardia are significantly improved." (Tr. 579). Following his physical examination, Bogomilov diagnosed Davis with palpitations, PACs, and PVCs, hypertension, syncope, weakness, fatigue, and shortness of breath. Davis was to

return in one year. (Tr. 579-584).

On October 10, Davis presented for a psychiatric assessment at Youth Home, Inc., stating that her doctor recommended the assessment. The result of the assessment was a recommendation that Davis schedule and engage in regular therapy and return in a year or as needed. (Tr. 598-602).

Gerald Stephen Greer ("Greer"), a cardiologist, saw Davis as a new patient on October 17. Physical examination found her to be well developed and well nourished, in no distress, with normal cardiovascular rate and rhythm, and normal gait. Greer noted that over the past three years Davis "has only had true syncope one time." (Tr. 605). Greer diagnosed POTS, and described the condition as chronic. Greer prescribed phenylephrine, adding that further changes could be made if this medication did not control her symptoms. Davis was to return in three months. (Tr. 605-609).

On October 26, Davis presented for evaluation at Chi Arthritis & Rheumatology Associates. Davis complained of diffuse myalgias, hip pain, concentration issues, and memory loss. Following a physical examination Davis was diagnosed with fibromyalgia, bursitis, and chronic pain. The plan was to continue with current medications, take injections for hip pain, return if problems worsen, and otherwise return in three months. (Tr. 588-590).

Davis returned to Baptist Health Neurology Clinic on November 6, complaining of a headache. She indicated her headaches were daily and, in addition, she had recently had a seizure lasting for several minutes. Following a physical examination where she was found to have a normal gait, Davis was diagnosed with chronic migraine headaches without aura, pseudoseizures, fibromyalgia, POTS, polypharmacy, tobacco abuse, memory loss, and mild cognitive impairment, so stated. The plan was explore the possibility of Botox to treat the migraines. (Tr. 626-634).

The relevant period ended on May 9, 2019.

**Claim 1: The ALJ erred by failing to fully and fairly develop the record by failing to obtain additional medical evidence regarding Davis' POTS.**

Davis cites a state agency expert, Dr. Takach, who wrote in June 2017 that he expected Davis to be capable of sedentary work assuming compliance with prescriptions by September 2017.[4] Davis contends the ALJ erred in failing to obtain a consultative examination demonstrating medical improvement after the June 2017 notation by Takach.[5] The ALJ did not err in this regard. Even though Davis is correct

---

[4] Takach's note read: "Currently undergoing Rx for POTS w/out complications – from the MER available – while she is a MMI – expect function at Sed exertion with Rx compliance by 9/30/17." (Tr. 97).

[5] Davis argues that a later opinion that she had achieved improvement was necessary

that the ALJ has a duty to fully and fairly develop the record, she fails to demonstrate how the record, which appears to contain all treatment records during the relevant period, was inadequate and how additional reports would cure the inadequacy. The objective medical evidence in this case was ample and the ALJ's decision was well-informed. *See Martise v. Astrue*, 641 F.3d 909, 926-27 (8th Cir. 2011) (ALJ not required to order additional medical exams unless the existing medical record is insufficient). While the ALJ has an obligation to fully develop the record, there is no bright line test for determining whether he has done so; the determination is made on a case by case basis. *See Battles v. Shalala*, 36 F.3d 43 (8th Cir. 1994). The key is whether the record provides the ALJ with ample information to allow an informed decision to be made.

Here, Davis points to notes in the medical records after the Takach's June 2017 notation which she alleges show no improvement in her POTS. These citations, however, include subjective assertions made by Davis, which do not shed light on her objective medical condition. The ALJ correctly cites medical treatment notes reflecting improvement, including Bogomilov's July 2018 assessment of significant

---

to "validate" Takach's June 2017 opinion. This argument assumes Takach intended such a result. Takach's note is also subject to a more literal, direct interpretation – if Davis complied with her medical directives until September 30, 2017, then she would be capable of sedentary work. The record shows no evidence of noncompliance between the time of Takach's note and September 30, 2017.

improvement, as well as Greer's October 2018 notation that her POTS was controlled with verapamil and fluids. In addition, the Takach note assumed Davis' compliance with medications, an assumption which was not lived out; Bogomilov noted in 2018 Davis had a history of noncompliance. There are also numerous treatment notes showing normal findings, as well as a lack of urgency among her providers. Finally, the ALJ assessed Davis' RFC to be *less than* the full range of sedentary work, while Takach's opinion dealt with the full range of sedentary work. Davis, who bears the burden of demonstrating her disability, provided an abundance of medical records chronicling her treatment during the relevant period. The ALJ weighed the medical evidence appropriately, and his conclusions are supported by substantial evidence. The ALJ properly relied upon the record before him, and there was no error in doing so. An additional consultative examination was not warranted.

**Claim 2: The Appeals Council erred by failing to consider new, material evidence -- a June 2019 prescription for a rolling walker.**

Approximately three weeks after the ALJ's May 19, 2019, decision, Davis was prescribed a rolling walker to assist with ambulation. The Appeals Council chose not to consider this prescription as evidence relating to disability during the relevant period. Davis correctly cites case law which requires the Appeals Council to consider new, material evidence which relates to the period on or before the date of the ALJ's

decision. *Williams v. Sullivan*, 905 F.2d 214 (8th Cir. 1990).

Davis contends this decision of the Appeals Council was erroneous because the prescription was new and material evidence documenting her medical care provider's opinion that the walker was a medical necessity. Davis cites six instances in the medical records showing her to have an antalgic gait and difficulties ambulating without a walker. (Tr. 352, 362, 416, 461, 468, & 557).

The flaw with Davis' argument lies in the timing and in her reliance upon selected treatment notes suggesting a problem with ambulating. With regard to timing, the prescription came *after* the ALJ's decision. The ALJ was tasked with assessing disability during the relevant period, and prescriptions given after the period had expired do not assist in performing this task.

The prescription does not become material evidence relating to the period on or before the date of the ALJ's decision simply because Davis cites to ambulation problems during the relevant period. Some of these citations are to subjective complaints. Even assuming all the citations were to medical findings, it is undisputed that no medical provider prescribed a walker during the relevant period. There are also numerous citations in the record to "normal gait" and ambulating normally. (Tr. 362, 366, 552, 608, & 631). Three different providers (OrthoArkansas, Baptist Health Neurology, and Greer) found Davis with a normal gait during the relevant period. The

ALJ was required to weigh the evidence, a part of which was the lack of a prescription for a walker during the relevant period. The Appeals Council did not err in its treatment of the post-ALJ decision prescription. The prescription was not material to Davis' disability during the period of time considered by the ALJ.

**Conclusion**

In summary, the Commissioner's ultimate decision was supported by substantial evidence. The Court is mindful that its task is not to review the record and arrive at an independent decision, nor is it to reverse if some evidence supports a different conclusion. The test is whether substantial evidence supports the ALJ's decision. *See, e.g., Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). This test is satisfied in this case.

IT IS THEREFORE ORDERED that the Commissioner's final decision is affirmed and Davis' complaint is dismissed with prejudice.

IT IS SO ORDERED this 10th day of March, 2021.

_____
UNITED STATES MAGISTRATE JUDGE